FILED
2012 Jan-11  PM 03:30
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| PERI ANITA STANLEY | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CASE NO. CV 11-J-1372-NE |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This matter is before the court on the record. This court has jurisdiction pursuant to 42 U.S.C. § 405. The plaintiff is seeking reversal or remand of a final decision of the Commissioner. All administrative remedies have been exhausted.

### Procedural Background

The plaintiff applied for Disability Insurance Benefits and Supplemental Security Income on September 12, 2007, alleging that she is bipolar and has "short term memory problems" (R. 63, 71, 72-74, 97-101, 105-107). The Administrative Law Judge ("ALJ") reached a determination that plaintiff was not disabled at any time through the date of his decision, January 15, 2010 (R. 19-36). The Appeals Council denied plaintiff's request for review on February 24, 2011  (R. 1-5). The ALJ's

1

decision thus became the final order of the Commissioner. *See* 42 U.S.C. § 405(g). This action for judicial review of the agency action followed (doc. 1). The court has considered the entire record and whether the decision of the ALJ is supported by substantial evidence. For the reasons set forth below, the decision of the Commissioner is due to be **REVERSED**.

### Factual Background

The plaintiff is a 51-year-old female, born April 24, 1960 (R. 35). Plaintiff's past relevant work experience is as a surgical nurse, a clinic nurse at a correctional facility, a case worker nurse, and an office worker (R. 65-66, 117). Plaintiff has four children (R. 290, 292), including a grown daughter (R. 157) and a son who is over eighteen, lives with plaintiff, and for whom she received child support as recently as 2008 (R. 99, 152, 154). Plaintiff is also raising her grandson because she is his guardian (R. 152).[1] Plaintiff has almost no financial resources, and receives food stamps (R. 106-07).

In her application, plaintiff claims disability beginning May 29, 2007 (R. 105), because of "bipolar and short term memory problems" (R. 71). Her application was

---

[1] In February 2008 plaintiff wrote that she has a sixteen-year old son and a three-and-a-half-year old son (R. 154). In the same document, however, she referred to these individuals as her son and grandson (R. 152). The record subsequently makes clear that the younger of the two referenced individuals is plaintiff's grandson, though it is not clear which of plaintiff's children is the grandson's parent. *See* R. at 98, 152.

denied because the Social Security Administration determined that while the evidence shows that plaintiff has "some restrictions," her condition was not severe enough to keep her from performing certain types of work (R. 71). Plaintiff's disability claim is related to memory problems which plaintiff avers began in the final years of her employment as a nurse at a hospital in Huntsville, Alabama, where she worked for approximately twelve years (R. 61). Plaintiff testified that for "about two years" prior to the end of that job, she "wasn't remembering things as well," and that she decided to take a sabbatical "of a few months and just take a break," and subsequently moved to Alaska (R. 61, 124). Plaintiff testified that "once the pressure was off her" after her move from Huntsville, she "felt comfortable" and found work in Alaska as a nurse (R. 61-62). However, shortly after her license was approved, she was fired from the job in Alaska (R. 62, 124). Plaintiff found several more jobs in Alaska, but was ultimately terminated from all of them due to her "inability to handle the job demands." (R. 124). Plaintiff then moved back to Alabama in August of 2007 because she believed she could no longer afford to live in Alaska after being terminated (R. 58, 106). She has not worked in any capacity since May 29, 2007 (R. 114).

Plaintiff was diagnosed with bipolar disorder in April 1997, with some symptoms originating as early as plaintiff's adolescence (R. 291). She was originally

treated in Huntsville, and was prescribed Klonopin[2] (approximately 0.5 mg/daily), and Eskalith[3] (450 mg/twice daily) (R. 291).[4] Her doctor noted at the time that she had hyperthyroidism (R. 291). Plaintiff also has a history of asthma (R. 233).

Plaintiff's bipolar disorder appears to have been manageable for several years after her diagnosis, from mid-1997 until mid-2000, and the medicine she took controlled her symptoms adequately. *See generally* R. at 269-90. Thereafter, there is a significant gap in her medical history in the record, at least insofar as concerns plaintiff's mental health. The relevant portion of the record commences again in 2007. In September of 2007 plaintiff's treating psychiatrist, Dr. John Wicks, prescribed plaintiff twelve months of individual and group therapy, in combination with her medicine, in an attempt to help her learn to "maintain [a] stable mood," "become more stabilized" and "get a job" (R. 234-35). Between January and May of 2008, Dr. Wicks noted on numerous occasions that plaintiff was "making fair

---

[2] Klonopin is a brand name of Clonazepam, which is used in the treatment of seizures. *See* PHYSICIANS' DESK REFERENCE 119 (PDR Network, LLC, 2011).

[3] Eskalith is a brand name of Lithium, which is used in the treatment of bipolar disorder. *See* PHYSICIANS' DESK REFERENCE 121 (PDR Network, LLC, 2011).

[4] Perusal of the record indicates that the identity and number of medications that plaintiff has taken for her mental problems, as well as the respective dosages thereof, have changed frequently since her initial diagnosis. Gaps in the record make it difficult to discern when many of these changes occurred. It does appear plaintiff had taken Lithium consistently for fifteen years and thyroid medications for "several years" as of August 2008 (R. 263). Any other information on plaintiff's relevant medication history is provided where available in the record.

4

progress decreasing depression" but "limited progress increasing memory" (R. 225-30). During this time, she began taking Lithobid[5] (450 mg/twice daily), Klonopin (0.5 mg/daily at bedtime), and Aricept[6] (10 mg/daily) (R. 231). She stopped taking the Aricept after three weeks because of headache, flu-like symptoms, and vomiting, which resolved after she stopped taking Aricept (R. 263).

In late May 2008 plaintiff's current medications were listed as Lithobid (450 mg/twice daily and 225 mg at bedtime), Klonopin (0.5 mg/daily at bedtime), and Aricept (10 mg/daily) (R. 231). In August 2008 plaintiff was evaluated by a neurologist in Alabama, Dr. Eston Norwood, who listed her "current medicines" as Lithium (450 mg/twice daily, "for more than 15 years"), "thyroid replacement for several years," "Lisinopril[7] for several years," Klonopin (0.5 mg/daily at bedtime "usually taken every night for a few weeks when needed and then she will be off Klonopin for weeks or months at a time"), and various over-the-counter supplements (R. 263).

---

[5] Lithobid is a brand name of Lithium, which is used in the treatment of bipolar disorder. *See* PHYSICIANS' DESK REFERENCE 121 (PDR Network, LLC, 2011).

[6] Aricept is a brand name of Donepezil, which is used in the treatment of dementia associated with Alzheimer's Disease. *See* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001006/ (last visited December 15, 2011).

[7] Lisinopril is a generic drug used in the treatment of hypertension. *See* PHYSICIANS' DESK REFERENCE 121 (PDR Network, LLC, 2011).

In November of 2008 plaintiff complained to Dr. Wicks that "she has great difficulty remembering things that should be important to her such as appointments" (R. 335). In June of 2009 plaintiff returned to Dr. Wicks, where she was concerned about "gradual deterioration" and was "convinced that she has some type of dementia because she has so much forgetfulness and absentmindedness" (R. 333). Dr. Wicks prescribed a two-week "trial" of Strattera (40 mg/daily), in addition to what he referenced as her "routine medications" of Eskalith (450 mg/thrice daily) and Klonopin (1 mg/daily) (R. 333). In June of 2009 Dr. Wicks noted that plaintiff "ha[d] been doing fairly well" and that "she's asking to be considered disabled in order to avoid having to repay some student loans" (R. 336). Dr. Wicks advised plaintiff that he "considered her able to perform some kind of gainful employment," and observed that "[s]he does not agree with this and agreed to consult with another psychiatrist regarding this issue" (R. 336).

In September of 2009 plaintiff went to another psychiatrist, Dr. Alan Piha, by referral from Dr. Wicks (R. 338). Dr. Piha noted that plaintiff was "disheveled," that her hair was not combed, and that her eyes were red (R. 339). He instructed patient to follow up with Dr. Wicks and gave her a telephone number so that "she can have her memory concerns addressed" (R. 339).

The record indicates that plaintiff reported a diagnosis of Alzheimer's disease

while living in Alaska (R. 239, 263), and that she was treated with herbs and supplements (R. 263). After an examination in August of 2008, Dr. Norwood, in Decatur, Alabama, wrote that he "d[id] not find objective evidence of cognitive impairment," and that plaintiff did not need to take a cholinesterase inhibitor for cognitive impairment (R. 264). The record contains no additional evidence of any diagnosis of Alzheimer's.

Plaintiff testified that she has problems with her short term memory, in that "things go in but they don't seem to stick in my mind," and that "to get it to be more of a longer term memory I have to consciously try to keep it in my mind, write it down, hold it in my hand, because if I set it down I'll forget it" (R. 63). She also testified to having problems with concentration and mood swings, the latter of which causes her to have difficulties getting along with people and being in groups (R. 63-64). She also claims to have trouble sleeping, and takes medication to help her sleep (R. 64).

In her physical activity questionnaire, plaintiff stated she has trouble sleeping, will often wake up in the middle of the night unable to return to sleep, and has to ask neighbors to remind her to take her medications and to help her shop (R. 150-51). Plaintiff is able to prepare meals for herself and her children (R. 151). Though plaintiff does go out of the house, she usually does so with others, and stated she

"need[s] help . . . finding [her] way home" (R. 152). She described herself as "easily distracted" by both people and "noises . . . like music, talking, air conditioners, [and] fans," such that she will "lose what concentration [she has] and have difficulty calming and thinking" (R. 155). Plaintiff also discussed becoming overwhelmed by any kind of stress or pressure; pressure arising from extensive social interactions would "overwhelm" her such that she would "minimize social activities" (R. 152), and stress arising from responsibilities at work would cause "tension" to "build[] up" such that plaintiff would "get rattled with being rushed by someone else's expectations for [her] performance" (R. 153). She also claims to be unable to take care of certain things "like taxes" even though they are "important" (R. 154). Because of these qualities, plaintiff usually prefers to stay home; she describes her "home and family life" as "calm, simple, and maintained with minimal amount of mental stress" (R. 154). As a result of these circumstances, plaintiff has become isolated and "ha[s] trouble with relationships" both personal and professional (R. 155). The daily activities questionnaire filled out by plaintiff's 25-year-old daughter supports plaintiff's complaints (R. 157-60).

Two medical source opinion forms were completed by plaintiff's treating psychiatrist, Dr. Wicks, and a therapist.[8] The first was dated June 20, 2008, and was

---

[8] The therapist's name is somewhat illegible, but appears to be "Kori Nitchen" (R. 224).

signed by Dr. Wicks and the therapist (R. 223-224). The 2008 forms indicated "extreme" levels of impairment in the ability both to "[u]se judgment in detailed or complex work-related decisions" and to "[d]eal with changes in a routine work setting" (R. 223). It also noted "extreme" levels of limitation in the ability to "[u]nderstand, remember, and carry out detailed or complex instructions" and in the ability to "[m]aintain attention, concentration or pace for periods of at least two hours" (R. 224). It also indicated a "marked" level of impairment in the ability to "[r]espond to customary work pressures" (R. 224). On other relevant assessment factors, plaintiff's level of impairment was listed as "mild" to "moderate" (R. 224-25). The forms indicated that plaintiff had experienced an increase both in memory loss and in levels of anxiety and depression (R. 224).

A second set of forms were completed by the same treating individuals, Dr. Wicks and the therapist, on November 4, 2009 (R. 361-362). At that time, plaintiff was noted to experience a "moderate" to "marked" level of impairment in the ability to "[u]se judgment in simple, one or two step, work-related decisions" (R. 361). She was also noted to exhibit "extreme" levels of impairment in "[using] judgment in detailed or complex work-related decisions" and in "[d]eal[ing] with changes in a routine work setting" (R. 361). Again, on other relevant assessment factors, plaintiff's level of impairment was listed as "mild" to "moderate" (R. 361-62). The forms

indicated that plaintiff continued to experience "some memory loss" (R. 362).

At the hearing, the ALJ proposed several hypothetical situations involving plaintiff's relative ability to work to the Vocational Expert ("VE") and asked for her opinion with respect to each. The ALJ's first hypothetical involved an individual of the claimant's approximate age at the time (47-49 years) with a high school education plus four years of college, a work history identical to the plaintiff's (fifteen years as a nurse or office worker), no physical restrictions, and with non-exertional restrictions that would restrict the claimant to the performance of only unskilled work and to "occasional[]" interactions with coworkers, supervisors, and the general public (R. 67). The VE testified that under this hypothetical, "all of [plaintiff's] past work" would be eliminated because it was skilled or lower semi-skilled, but that other jobs at the unskilled level would be available, including parts inspector, small products assembler, and "tagger" (R. 68). These examples are at the "light exertative level," and others would be available at both the "medium" and "sedantry" levels (R. 68).

The second hypothetical further assumed that the claimant's work-related abilities "are such that she would have problems with persistence, concentration and pace to the extent that she would be unable to perform even unskilled routine repetitive work for periods of up to two consecutive hours" (R. 69). The VE testified that such hypothetical "really would eliminate all work." *Id.* The VE testified that "all

jobs" would also be eliminated "if the claimant has problems interacting with other people and responding to stressful situations to the extent that she would have to withdraw from any such interaction." *Id.*

## Standard of Review

In a Social Security case, the initial burden of establishing disability is on the claimant, who must prove that due to a mental or physical impairment he is unable to perform his previous work. *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987). If the claimant is successful, the burden shifts to the Commissioner to prove that the claimant can perform some other type of work existing in the national economy. *Id.*

This court's review of the factual findings in disability cases is limited to determining whether the record contains substantial evidence to support the ALJ's findings and whether the correct legal standards were applied. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). "Substantial evidence" is generally defined as "such relevant evidence as a reasonable mind would accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

This court also must be satisfied that the decision of the Commissioner is

11

grounded in the proper application of the appropriate legal standards. *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988); *Bridges v. Bowen*, 815 F.2d 622, 624 (11th Cir. 1987); *Davis v. Shalala*, 985 F.2d 528 (11th Cir. 1993). No presumption of correctness applies to the Commissioner's conclusions of law, including the determination of the proper standard to be applied in reviewing claims. *Brown v. Sullivan*, 92 F.2d 1233, 1235 (11th Cir. 1991); *Corneliuis v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991). Furthermore, the Commissioner's "failure to . . . provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal." *Cornelius*, 936 F.2d at 1145-46. When making a disability determination, the Commissioner must, absent good cause to the contrary, accord substantial or considerable weight to the treating physician's opinion as against the opinions of other physicians. *Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1988); *Walker*, 826 F.2d at 1000.

## Legal Analysis

In this case, the ALJ found that plaintiff has the severe impairment of bipolar disorder, that she does not have the severe impairment of Alzheimer's disease, and that she has no exertional limitations (R. 21-22). He then denied the plaintiff benefits, finding that her mental impairment "does not meet or medically equal the criteria," the so-called "Paragraph B" criteria, listed in 20 CFR Part 404, Subpart P, Appendix

1 (R. 22). As the ALJ summarized, to satisfy the relevant criteria, the mental impairment "must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. A marked limitation means more than moderate but less than extreme." (R. 22). The ALJ found that in activities of daily living, plaintiff has "mild restriction"; in social functioning, she has "mild difficulties"; with regard to concentration, persistence, or pace, she has "moderate difficulties"; and with regard to episodes of decompensation, she has experienced none of "extended duration" (R. 22-23). Accordingly, "[b]ecause [plaintiff's] mental impairment does not cause at least two 'marked' limitations or one 'marked' limitation and 'repeated' episodes of decompensation, each of extended duration," the relevant criteria "are not satisfied" (R. 23).

The ALJ found that plaintiff's impairment "could reasonably be expected to cause the alleged symptoms," but that her "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with" the residual capacity assessment (R. 24-25).

The ALJ's findings are simply not supported by substantial evidence; in fact, they appear to contradict the weight of substantial evidence. The ALJ admits to

having "give[n] great weight to the assessments of state agency medical personnel that the claimant has no more than moderate mental limitations as that assessment is supported by the objective, clinical findings" (R. 34). In doing so, the ALJ determined that the opinion of psychiatrist Dr. Wicks was not supported by his treatment notes and was instead contradicted by one isolated statement, in June 2009, that plaintiff was capable of performing some kind of gainful employment (*see* R. at 336). In other words, he rejected the opinion of plaintiff's long-term treating psychiatrist and therapist in favor of one off-handed remark and the opinion of the non-examining Agency consultant.

The ALJ may reject the opinion of any physician when the evidence supports a contrary conclusion. *Bloodsworth v. Heckler*, 703 F.2d 1233, 1240 (11th Cir. 1983). The ALJ is required, however, to state with particularity the weight he gives to different medical opinions and the reasons why. *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987).

> Absent "good cause," an ALJ is to give the medical opinions of treating physicians "substantial or considerable weight." *Lewis*, 125 F.2d at 1440; *see also* 20 C.F.R. §§ 404.1527(d)(1)-(2). Good cause exists "when the: (1) treating physician's opinion was not bolstered by evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips*, 357 F.2d at 1241. With good cause, an ALJ may disregard a treating physician's opinion, but he "must clearly articulate [the] reasons" for doing so. *Id.* at 1240-41.

14

*Winschel v. Comm'r of Soc. Security*, 631 F.3d 1176, 1179 (11th Cir. 2011). In short, "good cause" exists if the opinion is wholly conclusory, unsupported by the objective medical evidence in the record, inconsistent within itself, or appears to be based primarily on the patient's subjective complaints. *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991); *see also Crawford v. Comm'r of Soc. Security*, 363 F.3d 1155, 1159-60 (11th Cir. 2004); *Lewis*, 125 F.3d at 1440.

The ALJ here did not have good cause for disregarding the treating psychiatrist's opinions. No medical evidence contradicts plaintiff's psychiatrist's conclusions; the only evidence which could be considered contradictory is the treating physician's isolated statement that he "considered [plaintiff] able to perform some kind of gainful employment" (R. 336). Yet that statement was made on June 3, 2009–prior to the final Medical Source Opinion Form that Dr. Wicks filled out on November 4, 2009, where he indicated that she had continued to experience "some memory loss" and was at least mildly to moderately impaired–if not extremely impaired–in every single assessment category listed (R. 361-62). These  results are similar to those found in the Medical Source Opinion Form that Dr. Wicks first filled out in June 2008 (R. 223-24), and if anything, demonstrate plaintiff's continued deterioration. This conclusion is supported by over three years worth of treatment notes documenting plaintiff's continued deterioration over this time. Even the VE

testified that in a hypothetical scenario in which an individual with characteristics nearly identical to the plaintiff, the individual in question would be incapable of performing "all work" (R. 69).

Further, the ALJ formed his opinion by placing the greatest weight on the opinion of a state agency psychiatrist–an individual who never even saw or examined plaintiff. The Eleventh Circuit has repeatedly held that the opinion of a non-examining reviewing physician is entitled to little weight and, taken alone, does not constitute substantial evidence to support an administrative decision. *Swindle v. Sullivan*, 914 F.2d 222, 226 n.3 (11th Cir. 1990). "[T]o attempt to evaluate disability without personal examination of the individual and without evaluation of the disability as it relates to the particular person is medical sophistry at best." *Spencer on behalf of Spencer v. Heckler*, 765 F.2d 1090, 1094 (11th Cir. 1985). The opinion of non-examining, reviewing physicians, when contrary to those of examining physicians, are entitled to little weight in a disability case, and standing alone do not constitute substantial evidence. *Sharfarz v. Bowen*, 825 F.2d 278, 280 (11th Cir. 1987).

In light of these considerations, the court finds the record devoid of substantial evidence to support the decision of the ALJ. The Commissioner's "failure to apply the correct law or to provide the reviewing court with sufficient reasoning for

determining that the proper legal analysis has been conducted mandates reversal." *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991). Here, multiple medical opinions concerning the nature, origins, and severity of plaintiff's mental disability due to chronic bipolar disorder, from which the record demonstrates she has suffered for decades, are before the court. By inferring that plaintiff was able to work from his selective review of the evidence, the ALJ substituted his opinion for that of all of the medical reports in the file, which taken together establish that plaintiff is indeed disabled.

### Conclusion

Based on the foregoing, the court is of the opinion that the decision by the ALJ was not supported by substantial evidence, and therefore the decision of the Commissioner must be **REVERSED** and this case **REMANDED** for the calculation of benefits to which plaintiff is entitled.

**DONE** and **ORDERED** the 11th day of January 2012.

INGE PRYTZ JOHNSON
U.S. DISTRICT JUDGE